1

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8

Tyson Joseph Hiland,                    )      No. CV-14-8069-PCT-NVW (JZB)
9                                       )
                                        )
10                      Petitioner,     )      **REPORT AND RECOMMENDATION**
                                        )
11     vs.                              )
                                        )
12                                      )
     Charles L. Ryan, et al.,           )
13                                      )
                                        )
14                      Respondents.    )
                                        )
15   _____)

16   TO THE HONORABLE NEIL V. WAKE, DISTRICT JUDGE:

17        Petitioner Tyson Joseph Hiland, who is confined in the Arizona State Prison, has

18   filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. 1.)

19   **I.     Procedural Background[1]**

20        The writ of habeas corpus affords relief to persons in custody pursuant to the

21   judgment of a state court in violation of the Constitution, laws, or treaties of the United

22   States. 28 U.S.C. §§ 2241(c)(3), 2254(a). Petitions for Habeas Corpus are governed by

23   the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2244.

24        **A. Charges**

25        On June 8, 2007, Petitioner and co-defendants Joseph Hiland (Petitioner's father),

26   _____

27        [1] The procedural background recounted here substantially mirrors, with Magistrate
     Judge Bade's concurrence, the procedural background contained in the Report and
28   Recommendation relating to the habeas corpus petition filed by co-defendant Travis
     Hiland in CV-13-08110-PHX-PGR (BSB). Travis Hiland's matter is pending.

Travis Hiland (Petitioner's brother), and Stephen Cottrell were indicted by a Yavapai County Grand Jury on one count of conspiracy to commit theft (Count One), one count of theft (Count Two), one count of fraudulent schemes and artifices (Count Three), and one count of participating in a criminal syndicate (Count Four), all class two felonies. (Doc. 12, Ex. A.) The indictment alleged that, through a Ponzi-type scheme, Petitioner and his co-defendants obtained funds totaling $1,658,849.71 from over 20 individuals, who were identified as victims in the indictment. (*Id.*)

**B. Rule 17.4 Hearings**

The case was assigned to Superior Court Judge Thomas Lindberg. (Doc. 12, Ex. B.) Pursuant to Arizona Rule of Criminal Procedure 17.4, Petitioner and his codefendants participated in several plea negotiation conferences before Superior Court Judge Robert Brutinel. (Doc. 12, Exs. C, D, KK, LL.)

Over the course of those conferences, the State offered to allow the defendants to plead guilty to theft and fraudulent schemes in exchange for dismissing the other charges, provided that all of the defendants agreed to plead guilty. (Doc. 12, Ex. LL at 7-8.) The State indicated that it would consider recommending a sentencing range of three to twelve-and-a-half years' imprisonment on each charge with the possibility of probation. (Doc. 12, Ex. KK at 12-13.) The State told Judge Brutinel that it "would be looking for prison with respect to the two [younger] Hilands, but for Joe Hiland . . . [it] would probably" recommend probation because of his poor health. (Doc. 12, Ex. LL at 9.) For Petitioner and co-defendant Travis Hiland, the State said "[w]e want that range of three to 12.5 years . . . I don't know that in the end we would be recommending the maximum, but I don't want to make any promises that anyone relies on as part of the settlement negotiations what our position would be." (*Id.* at 11.) The State explained that it wanted a presentence hearing and for the victims to be able to testify. (*Id.*)

Judge Brutinel told Petitioner and his co-defendants that the State was "not willing to make a recommendation [about sentencing] one way or the other," and that they "want to attend the presentence hearing and listen to the victims testify before they make a

recommendation." (*Id.* at 11.) Judge Brutinel stated "I don't see [the State] making a specific recommendation. I don't see them agreeing to a cap." (*Id.* at 12.) Judge Brutinel further stated "if [the defendants] wanted to take the offer the State's making, you are kind of looking at the range between three and 12-and-a-half with the possibility of probation. I mean, that's the ball park we are talking about." (*Id.* at 14.) Judge Brutinel reiterated to Petitioner and his counsel that "I don't see them offering you a probation mandatory plea." (*Id.* at 18.)

On December 22, 2008, during the final Rule 17.4 conference before Judge Brutinel, Travis Hiland's counsel argued that it could be considered coercive to "have a group of people that are forced to take a unified plea." (Doc. 12, Ex. LL. at 4.) The State argued that, pursuant to *State v. Solano*, 150 Ariz. 398 (1986), package-plea deals were appropriate so long as the court reviewed the totality of circumstances surrounding the plea and ensured it was not coercive. (*Id.* at 7-8.) Judge Brutinel acknowledged that a "package plea offer which purports to offer a benefit to a third party does indeed require some extra judicial scrutiny," concluding that under Arizona law, "package deals are okay, but you need to be careful with them." (*Id.* at 17-18.) The change of plea was scheduled for the following day, December 23, 2008. (*Id.* at 35.)

**C.    The Plea Agreement and Change of Plea Hearing**

On December 23, 2008, Petitioner, his brother, and father pleaded guilty to one count of theft in violation of Ariz. Rev. Stat. § 13-1802, a class two felony, and one count of fraudulent schemes in violation of Ariz. Rev. Stat. § 13-2310, a class two felony. (Doc. 12, Ex. F at 1; Ex. MM.) The remaining counts of the indictment were dismissed. (*Id.* at 3.)

Petitioner's plea agreement provided that "each Class 2 felony carries a presumptive sentence of 5 years; a minimum sentence of 4 years (3 years if the court finds exceptional circumstances); and a maximum sentence of 10 years (12.5 years if the Court finds exceptional circumstances)." (*Id.* at 1.) The agreement provided that probation was available "for a term not to exceed 7 years." (*Id.* at 2.) The plea agreement

1    also required the payment of $1,663,849.71 in restitution to the listed victims. (*Id.* at 2.)

2    Petitioner also agreed "to make a factual basis for the change of plea." (*Id.*)

3          Pursuant to paragraph seven of the plea agreement, Petitioner "consent[ed] to

4    judicial fact-finding by a preponderance of the evidence as to any aspect or enhancement

5    of sentence." (*Id.* at 4.) That paragraph also stated that Petitioner "completely

6    understand[s] and agree[s] that by entering into this Plea Agreement . . . any sentence

7    either stipulated to or recommended herein [] is not binding on the court." (*Id.*) Paragraph

8    seven further provided that "[i]n making the sentencing determination, the Court is not

9    bound by the rules of evidence." (*Id.* at 4.)

10         Paragraph eight reiterated that Petitioner understood that the sentencing

11   recommendations in the plea agreement were not binding on the court, and that the court

12   was "bound only by the limits set forth in paragraph 1 and the applicable statutes." (*Id.*)

13   The plea agreement provided that Petitioner had "discussed the case and [his]

14   constitutional rights with [his] lawyer." (*Id.* at 4.)

15         At the change of plea hearing, Judge Lindberg discussed Petitioner's sentencing

16   exposure and emphasized that the plea agreement permitted it to sentence Petitioner

17   within the range provided for in that agreement:

18               If I find both aggravating and mitigating circumstances, the

19   whole range of sentence is available to the Court, from the very minimum to the very maximum. . . . I just want to

20   convey to you the whole range of sentence is open if both aggravating and mitigating circumstances are found.

21   (Doc. 12, Ex. MM at 11.)

22         The court and Petitioner then had the following exchange:

23         COURT:        Tyson did you read the plea agreement and go

24                             over it completely before signing it?

      PETITIONER:   Yes.

25         . . .

26         COURT:        Tyson, do you understand the plea agreement?

27         PETITIONER:   I do.

      . . .

28

4

| | | |
|---|---|---|
| COURT: | Did [your attorney] explain the plea agreement to you in full before you signed it . . . Tyson? | |
| PETITIONER: | Yes. | |

. . .

| | |
|---|---|
| COURT: | Tyson, has anybody made you any promises, guarantees or assurances, other than what is contained in the plea agreement? |
| PETITIONER: | No. |
| COURT: | Has anybody threatened you or forced you or coerced you into entering the plea agreement . . . Tyson? |
| PETITIONER: | No. |

. . .

| | |
|---|---|
| COURT: | Whether you enter the plea agreement has to be your own individual choice . . . . Tyson, do you understand that? |
| PETITIONER: | Yes. |
| COURT: | I recognize that this was done as a package deal inclusive of Joseph Hiland, your father. But do you understand that if you did not wish to enter the plea agreement, you don't have to enter the plea agreement? Is that your understanding . . . Tyson? |
| PETITIONER: | Yes. |

. . .

| | |
|---|---|
| COURT: | Tyson, are you entering your plea agreement voluntarily of your own free will? |
| PETITIONER: | Yes. |

(*Id.* at 16-18.)

The court outlined the two counts to which Petitioner and his brother agreed to plead guilty. (*Id.* at 19.) The court then outlined the range of possible sentences to be imposed for the two counts:

| | |
|---|---|
| COURT: | Let's go over the range of sentence that is available. Each Class 2 felony can carry prison time. The presumptive sentence is five years. The least I could give is three years. The most I could give is twelve-and-a-half years for each count . . . Tyson, do you understand that |

1        PETITIONER:    Yes.

2    (*Id*. at 21.) The court also outlined the $1,663,848.71 restitution Petitioner owed, as

3    detailed in the plea agreement, and Petitioner agreed. (*Id*. at 26.)

4        During the plea hearing, the court specifically addressed Petitioner regarding the

5    package-deal plea. (*Id*. at 33.) Co-defendant Travis Hiland's counsel stated he had gone

6    over the meaning of the *Solano* case with all three Hiland defendants, including

7    Petitioner. (*Id*. at 34.) The court had the following exchange with Petitioner and his

8    brother, Travis:

9        COURT:    I think with regard to the case law, Mr.
10   Williams, Mr. Napper, because this is a package deal, I think I need some further record under
11   *Solano* with regard to that.

12       So, Mr. Black or Mr. McGrane, if you are familiar with the factors in *Ybarra* and *Solano*,
13   it seems apparent to me, honestly, because I have been dealing with this case, that there may
14   be some reasons for the negotiation that does a joint or package plea agreement. But do you want to expound on that at all?

15       MR. WILLIAMS:    Judge, if I could assist on that.

16       COURT:    Mr. Williams.

17       MR. WILLIAMS:    We entered into the 17.4 negotiation before
18   Judge Brutinel with the State and all four defendants in the case. I put on the record when
19   we started my *Solano* concerns. The Court then got a copy of it. The State, I believe, provided
20   that copy.

21       I have gone over what that means with all four, or actually, all three of the Hilands, and in
22   particular with my client, Travis, and I can tell the Court that he is not receiving this plea so
23   that another member of his family gets is a favorable plea.

24       The reason we took out the accomplice language and the conspiracy language of the
25   plea agreement is because he is entering this plea agreement for his own actions, and it is his
26   own decision. And that is what I will put on the record, Judge.
27

28       COURT:    Travis, is that correct?

6

| | | |
|---|---|---|
| 1 | TRAVIS: | Yes. |
| 2 | COURT: | You are doing this of your own volition for the things that you are facing, the potential consequences of going to trial   that you are facing, not because the other family member or members may receive benefit from this? |
| 5 | TRAVIS: | That's correct. |
| 6 | COURT: | Tyson, is that your position, also? |
| 7 | PETITIONER: | The same. |
| 8 | COURT: | You are doing this for your own sake based on what is being offered to you, not because some other family member, either your brother or your father, is getting some kind of deal? |
| 11 | PETITIONER: | I know. |
| 12 | COURT: | Is there any other fact, then, other than the plea agreement itself and what you are looking at there, in terms of consequences versus going to trial and the consequences or possible outcome there, that is influencing you to any degree, Travis? |
| 15 | TRAVIS: | No. |
| 16 | COURT: | Tyson, any other considerations that are influencing you, other than your own viewpoint of the benefits of the plea agreement versus going to trial? |
| 18 | PETITIONER: | No. |

20    (*Id.* at 34–35.)

21    Co-defendant Travis Hiland's counsel then provided the following factual basis

22    for the plea:

> Both counts covered between January 2nd of 2002 and August 31st of 2005. Travis was selling investments that ranged, but are not limited to, a shrimp farm, resort hotel named La Contessa. There was some timber involved. And he at some point knew or should have known that Mr. Cottrell was having difficulty with the investments. And then particular victims. . . not limited to, Wanda Orr and the Rutledges alerted his office that they were not getting payments accordingly, and he continued to sell those

properties, Travis did, despite knowing there [were] material problems with them.

And also there were payments being made. Now, those payments were coming from Mr. Cottrell's office via check to where . . . Travis Hiland was working. And they were being converted into withdrawals from the bank. The payments coming were termed loan. And Mr. Hiland had never gone over with his clients that there was going to be commissions coming out of what was paid into them.

[T]he State disclosed that something like 40-percent of the aggregate amount that went in were paid out to the Hilands, in general. About $190,000 over the period of three years was paid to Travis Hiland. He knew or should have known that the money was inappropriately going to him. That justifies the theft. He didn't alert any authorities to it, and he accepted the money. And as I said, continued to sell the property.

(*Id.* at 37-38.)   Petitioner confirmed that the factual basis counsel provided was "true."

(*Id.* at 38.)

The court then had the following exchange with Travis and Petitioner:

COURT: Travis do you think in connection with your own actions that you were engaged in fraudulent schemes, then, in the course of defrauding folks of their money that they weren't going to see their money as a result of these actions, once you learned about the co-defendant, Mr. Cottrell's, actions?

TRAVIS: I believed Cottrell, but there came a time where I probably should have known.

COURT: And after that you continued to invite further investment into the products?

TRAVIS: Yes.

COURT: And that resulted in some benefit to you and loss of finances by the investors?

PETITIONER: Yes.

COURT: Is that the case with you also, Tyson?

PETITIONER: It is the same, yes.

(*Id.* at 39–40.) Petitioner then pled guilty to both counts, and the court accepted the pleas.

(*Id.* at 40; Ex. E.)

**D.    Presentence Hearing and Sentencing**

8

Between January 22 and March 12, 2009, the trial court conducted a presentence hearing during which 38 witnesses testified, including 16 victims and 20 witnesses on Petitioner's behalf. (Doc. 12, Exs. G, NN-SS; Doc. 16, Exs. TT-YY.) Retired Detective Anna Cahall testified regarding her investigation of the case, and John Fink, a financial expert from the Arizona Corporation Commission (ACC), testified about his analysis of the money trail of the victims' payments into the various accounts and then to the individual defendants. The State also filed numerous victim impact statements, and Petitioner and his co-defendants filed numerous letters attesting to their good character. (Doc. 12, Exs. H-J.)

### 1.       Letter from Detective Cahall

For purposes of sentencing, on March 3, 2009, the State filed a letter from Detective Cahall. (Doc. 12, Ex. K.) The letter, addressed to Judge Lindberg, stated:

> There were very few times in my career that I gave my opinion to a judge regarding the sentencing of defendants, but I would like to take the opportunity in this case. You may remember my first case involving the exploitation of an elder that you charged – the victim was Gertrude Medd, and the defendants Val Light and Jon Haywood. At that time, such cases were unusual and we struggled with how to charge it, if at all. Unfortunately since that time, these types of cases have become all too common, and in fact were the majority of my caseload in my last few years as a Detective.
>
> As you have heard, the current case involved a long and complex investigation and I personally interviewed close to 60 victims (many who were involved in the earlier investment schemes, where the products were misrepresented as well) . . . . Many of the victims whose investments with the defendants were not charged kept in contact with me and during the four years of this investigation I saw many of both groups suffer the effects of their years — recurrences of cancer, strokes, heart attacks, and many deaths. It is also clear the defendants took advantage of the ages of the victims in the excuses and lies they gave as to why the investments weren't working.
>
> I won't pretend this case hasn't affected me personally — it has, and in fact played a large role in my decision to retire early. But more importantly, these victims — many from the Greatest Generation — a proud and trusting generation who survived the toughest of times and worked hard to save what little they had, were consciously targeted and ruthlessly taken advantage of. To sit in court and hear the defendants try to minimize their roles even after entering pleas of guilty does

9

> more than add insult to injury. It confirms to me that they
> have no remorse for what they have done. To claim ignorance
> is insulting and an unconscionable excuse. Their actions since
> the Corporation Commission's Cease and Desist Order
> further shows their lack of remorse and certainly a disregard
> for a court's order to create the activity and pay restitution.
>
> I hope you will make a statement, through your sentencing,
> that this type of blatant exploitation will not be tolerated in
> our County. Although many of the victims simply asked for
> their money back, the likelihood of any of these defendants
> obtaining employment that would provide even minimal
> reparations to these victims is doubtful. Please demonstrate
> that our system of justice works and if we can't protect our
> elders from exploitation, the response after will be certain and
> considerable.

(*Id.*)

On March 12, 2009, the date of sentencing, Petitioner and his co-defendants filed a motion to disqualify Judge Lindberg based, in part, on the Cahall letter. (Doc. 12, Ex. N.) Judge Lindberg addressed the motion at the outset of the sentencing proceeding. (Doc. 12, Ex. ZZ.) He noted that the parties knew he was a prosecutor before he became a judge, and made the following statement about the letter:

> I received a copy of a notice of filing that pertained to a letter
> addressed to me from now-retired Detective Cahall. I will say
> that, like all of the other pleadings that are filed in a case, I
> began to read that letter, and I will say that I thought it was
> inappropriate — with no offense intended — but I thought it
> was inappropriate to raise other cases with me as
> distinguished from alluding to what occurred in this case. So,
> in all honesty, I put it down and didn't finish reading it.
>
> I have finished reading it now because it was attached to the
> motion for the Court to disqualify itself. That notice was filed
> on March 2nd. This matter proceeded to additional hearing on
> March 5th . . . .
>
> I reviewed the request. I'll note that there was not a motion to
> strike the letter. I'll note that the matter proceeded to hearing
> after the notice had been sent and distributed to defense
> counsel.
>
> I don't feel particularly, in the manner in which I handled it,
> that it provides a reason why I ought to disqualify myself, so I
> am declining to disqualify on the case.

(Doc. 12, Ex. ZZ at 3-4.)

Judge Lindberg, however, referred the matter to Judge Brutinel to resolve the motion for disqualification. (*Id*. at 6-7.) After conducting a hearing on the motion, Judge Brutinel denied it, stating:

> It appears to me that what effectively is disclosed to you is all the things that you already knew, which is that Judge Lindberg was a prosecutor. Judge Lindberg charged cases. That Judge Lindberg was involved in a number of different cases, including as it turns out a case such as this one.

> I do not find that it was improper for Judge Lindberg to hear the case having been a member of the prosecutor's office. It is not improper for him to have been the trial judge in this case having worked on a case similar to this one. There is nothing in the canons which would mandate disqualification as a result of any of those things, and I frankly do not find anything contained in the letter or as a result of the letter which would cause Judge Lindberg to have to be.

> As opposed to — I don't decide whether there is misconduct on the part of the State or misconduct for that matter on the part of Detective Cahall, but I simply don't find that the letter in and of itself creates an appearance of impropriety.

(Doc. 12, Ex. AAA at 40.)

When the sentencing proceeding resumed before Judge Lindberg, he stated that he was striking that Cahall letter and reiterated that he would not consider that letter in sentencing any of the defendants:

> I am striking the letter and the notice of filing the letter of former or now-retired Detective Cahall.

> My view of it is what I explained earlier this morning, which was, I thought, when one puts on a robe, I think what you need to do is to address each case that you have, each defendant that you have, in an objective and independent fashion, not losing anything that you ever knew in terms of legal experience. . . . In all things, you are trying to be neutral and objective.

> And the reason why I stated that I had only commenced reading the letter when it first came in was because I read everything that comes in. But I regarded it . . . as going into, in some aspects — not all, but in some aspects, personal history as distinguished from something that was legal precedent or something that pertained to the particular case. And in later reading it, pursuant to the request to recuse, I see in many ways it is talking about this case and this case only.

> But I think the color of the initial part, with due respect to

1    ringing a bell . . . I think the judges are called upon all the
2    time to ignore. And I tell you that I will ignore the letter. I am
     striking it . . . .

3    (Doc. 12, Ex ZZ at 33-34.)

4            **2.      Other Presentence Motions and Sentencing**

5            Before the sentencing proceeding, Defendants had also filed a motion to dismiss, a

6    motion to disqualify the county attorney's office, and a motion to compel additional

7    discovery pertaining to the case referenced in the Cahall letter and the State's

8    communications with the victims, all of which the trial court denied. (Doc. 12, Exs. L-N;

9    O; Doc. 12, Ex. ZZ at 62.) Petitioner and his co-defendants then moved to stay the

10   sentencing proceeding to permit them to file a special action for review of the several

11   motions the trial court had denied. The trial court denied that request. (Doc. 12, Ex. ZZ at

12   63.)

13           After denying the co-defendants' motions, the trial court proceeded to sentencing.

14   The State recommended ten-year prison sentences for Petitioner, Travis Hiland, and

15   Cottrell for the first count (theft), to be followed by probation on the second count

16   (fraudulent schemes). (*Id.* at 88.) The State recommended probation for Joseph Hiland

17   because his advanced age and poor health would make his incarceration very costly. (*Id.*)

18   In support of its sentencing recommendations, the State noted that Petitioner and his

19   codefendants had had the opportunity, but did not, change their business practices after

20   the ACC ordered them to return $16 million to the investors they had misled. (*Id.* at 70-

21   71, 76, 83.) The State also emphasized that many of the vulnerable victims had lost their

22   life savings. (*Id.* at 84-88.)

23           All of the co-defendants minimized their participation in the scheme. Cottrell's

24   counsel argued that he was an unsophisticated dreamer, who did not sell the investments

25   and did not know the investors were elderly. (*Id.* at 91- 92.) The court sentenced Cotrell

26   to ten years' imprisonment followed by a seven-year term of probation. (*Id.* at 91.)

27   Petitioner's counsel argued that Petitioner was only following in his father's footsteps.

28   (*Id.* at 151-152.) The court sentenced Petitioner to ten years' imprisonment followed by

                                         12

seven years' probation. (*Id.* at 163.) Joseph Hiland's counsel emphasized that after he had a stroke in 2003, he quit running the operation. (*Id*. at 116.) The court sentenced Joseph Hiland to seven years' supervised probation "nearly exclusively on the basis of [his] health condition." (*Id.* at 122). Travis Hiland's counsel argued Travis was a peripheral participant. (*Id*. at 130-31.) Travis's counsel also argued that Cottrell came up with the ideas for the investments and that he was only guilty of not doing his due diligence after he became suspicious. (*Id*. at 130-34.)   The court sentenced Travis to nine years' imprisonment followed by seven years' supervised probation. (*Id.* at 144-145.) The court also ordered the restitution of $1,663,849.71 to be paid jointly and severally by the co-defendants. (*Id.*)

### E.    Post-Conviction Proceeding

On February 11, 2011, Petitioner filed a petition for post-conviction relief in the trial court pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. (Doc. 12, Ex. X.) Petitioner claimed that his "package-deal" guilty plea violated the Fourteenth Amendment, his lawyer's advice was ineffective and violated the Sixth and Fourteenth Amendments, his sentence violated the Fifth Amendment, and an impartial judge violated his rights under the Fifth, Eighth, and Fourteenth Amendments. (*Id.*) As discussed below, the trial court[2] issued a joint ruling addressing the claims that applied to all defendants and a separate supplemental ruling addressing Petitioner's specific claims. (Doc. 12, Exs. AA, BB.)

### 1.    Joint Ruling on Claims Affecting all Defendants

The post-conviction court noted that the co-defendants raised several of the same claims, specifically: (1) whether the trial court was biased by the Cahall letter and the presentation of evidence during the presentence hearing; (2) whether the plea negotiations and colloquy complied with *Solano*; (3) whether the court properly imposed consecutive sentences, properly considered pecuniary gain as an aggravating factor,

---

[2] The post-conviction matter was handled by the Honorable Cele Hancock.

1    properly considered mitigating factors, and whether there was improper sentencing

2    disparity; and (4) whether the defendants entered the plea agreement free of duress and

3    with a full understanding of their sentencing exposure. (Doc. 12, Ex. AA at 2.) The post-

4    conviction court denied relief on these claims.

5                              **a.      Presentence Hearing**

6            The court rejected the claim that the trial court was biased based on events related

7    to the presentence hearing. (*Id.* at 2-3.) Specifically, the court found "no basis in the

8    record to find that Judge Lindberg was biased due to the 'Cahall letter.'" (*Id.* at 2.) The

9    court also concluded that Judge Lindberg was not biased by the prosecutor's arguments at

10   the pre-sentence hearing. The post-conviction court also found that evidence of the ACC

11   ruling did not bias the trial court because it considered the ACC evidence only as

12   background information. (*Id.*) The post-conviction court also concluded that the trial

13   court had "clearly considered all the mitigating and aggravating factors and specifically

14   applied them to each of the defendants." (*Id.* at 2-3.) The post-conviction court found no

15   evidence that the prosecution had manipulated the witnesses and victims who testified at

16   the presentence hearing. (*Id.*) In summary, the post-conviction court found "nothing in

17   the record to support the allegations that the State acted inappropriately." (*Id.*)

18                    **b.   Plea Negotiations and Voluntariness of Guilty Pleas**

19           The post-conviction court next found that the plea negotiations did not violate the

20   standards articulated in *Solano*, and that the guilty pleas were voluntary in compliance

21   with the Due Process Clause. The court explained that *Solano* requires the trial court to

22   scrutinize any "package deal" to ensure the plea is not induced by a favor offered to one

23   of the co-defendants. (Doc. 12, Ex. AA at 3-4.) However, the court noted that the trial

24   court is not required to make specific findings as to each factor articulated in *Solano*. (*Id.*)

25   The court then discussed the Rule 17.4 conferences that led to the plea agreement and

26   noted that the "State was careful to emphasize that the possible recommendation of

27   probation for Joseph Hiland was not made to induce the remainder of the defendants to

28   plead guilty," but was based on Joseph Hiland's poor health. (*Id.*) The court also noted

                                                14

that the range of possible penalties under the plea agreement was discussed in detail with all of the defendants and their attorneys. (*Id.* at 3.)

The post-conviction court also discussed the trial court's detailed inquiry to ensure that each defendant entered the plea deal voluntarily and not to benefit another defendant. (*Id.* at 4-7.) The post-conviction court found that:

> [T]he plea offers in the instant case were not entered into contrary to law as there was no leniency promised to any Defendant if another Defendant entered into the plea, only an acknowledgement of the possible mitigating factors for the State to consider regarding Joseph Hiland. Each of the plea agreements were probation eligible. This is not a case where only Joseph Hiland's plea agreement was probation eligible.

(*Id.* at 7.)

The post-conviction court also found that there was a factual basis for the pleas. (*Id.* at 8.) The court further found that, "[e]ven assuming that there was some psychological pressure placed on Travis and Tyson Hiland regarding the possibility of their father's sentence," that pressure did not make the plea involuntary, especially considering the trial court's efforts to ensure the voluntariness of the pleas. (*Id.*) The court concluded that "[t]here are no other relevant factors that impermissibly influenced Tyson or Travis's plea. The transcript is clear. Judge Lindberg labored to ensure that both Defendants were entering into the plea agreements of their own volition and not because of any outside promises or coercion." (*Id.*)

The post-conviction court further found that the defendants entered the plea agreements voluntarily and with full understanding of their sentencing exposure. (*Id.* at 11-12.) The court noted that, during the plea negotiations, while the State agreed that probation was possible, the State refused to indicate the particular sentences it would recommend for Petitioner, Travis Hiland, and Cottrell. (*Id.* at 11.) Additionally, the full range of sentencing was discussed with all of the defendants during the Rule 17.4 conferences. (*Id.*) The post-conviction court also noted that at the change-of-plea hearing, Petitioner and his codefendants affirmed several times that they entered their pleas

15

1    voluntarily and that they were not based on any promise or agreement with the State that

2    was not memorialized in the plea agreement. (*Id.*)

3         The post-conviction court also noted that the plea agreements did not contain any

4    guarantees as to the State's sentencing recommendations and accurately stated the

5    sentencing ranges. (*Id.* at 11-12.) The post-conviction court concluded that "Tyson and

6    Travis Hiland and Steven Cottrell were fully advised as to the range of possible

7    sentencing and that all three Defendants indicated that they understood the range of

8    sentencing and answered several times that they were not entering into the plea

9    agreement under any type of duress or coercion." (*Id.* at 12.)

10                    c.    **Consecutive Sentences**

11        The post-conviction court next concluded that the consecutive sentences did not

12   violate the prohibition against double punishment. (Doc. 12, Ex. AA at 8.) The court

13   conducted the analysis required under *State v. Gordon*, 778 P.2d 1204 (Ariz. 1989), to

14   determine whether the crimes constituted one act or multiple acts that could be punished

15   separately. (*Id.* at 9.) The court concluded that "the act of the fraud scheme is separate

16   from the act of the actual taking of the funds for their own use." (*Id.*) The court explained

17   that the defendants knowingly obtained a benefit by misrepresenting that they had actual

18   investment opportunities for the victims and that they would benefit from the

19   investments. (*Id.*) The Defendants then received money from the victims and kept the

20   money for their own gain. (*Id.*) Because fraud and theft were separate acts, the court held

21   that "[c]onsecutive sentencing under *Gordon* is not contrary to law in this case." (*Id.*)

22        The post-conviction court next found that the trial court did not err by considering

23   pecuniary gain as an aggravating circumstance. (*Id.* at 10.) The court noted that pursuant

24   to *State v. Germain*, 723 P.2d 105, 108 (Ariz. 1986), if the state legislature has

25   specifically identified an aggravating factor in Ariz. Rev. Stat. § 13-702, it may be used

26   to enhance a sentence, even if it is an element of the charged offense. Because § 13-702

27   specifically identified pecuniary gain as an aggravating factor, the court concluded that

28   the trial court properly considered pecuniary gain an aggravating factor. (*Id.* at 9-10.)

16

The post-conviction court next found that the trial court properly considered the mitigating factors for each defendant and there was no improper sentencing disparity. (*Id.* at 10-11.) The court noted that, at sentencing, each defendant and his counsel addressed the court and the trial court reviewed each defendant's particular role in the events "even to the point of naming the particular victims that each of them had contact with and that victim's personal situation." (*Id.* at 10.) The court also noted that the trial court had reviewed numerous letters written on behalf of the individual defendants. (*Id.*)

The post-conviction court also discussed the aggravating and mitigating circumstances the trial court considered for each defendant. (*Id.* at 10-11.) The post-conviction court stated that "[t]he record shows that Judge Lindberg went to great lengths to avail himself of the aggravating and mitigating circumstances in each individual case. There is nothing in the record that shows that Judge Lindberg failed to consider mitigating factors in this case. Aggravated sentences were not improper under law in this case and any disparity in sentencing was considered and explained on the record." (*Id.* at 11.)

### 2.    The Supplemental Ruling on Petitioner's Claims

In a supplemental ruling, the post-conviction court addressed Petitioner's separate claim that trial counsel misadvised Petitioner regarding the likely sentence in the case. (Doc. 12, Ex. BB.) The post-conviction court found that trial counsel did not provide ineffective assistance.  The court found the record did not support Petitioner's claims. The court found the record did not support Petitioner's claim that counsel "guaranteed" a lower and concurrent sentence. (*Id.* at 1.) Instead, the court concluded the record reflected that Petitioner was advised numerous times on the record that there were no guarantees, and that Petitioner faced lengthy and potentially consecutive sentences. The court also noted that it had reviewed the entire file and record in the case and found no basis to grant relief under Rule 32. (*Id.* at 5.)

### 3.    Petitions for Review by Higher State Courts

Petitioner filed a petition for review of the trial court's denial of his petition for

post-conviction relief in the Arizona Court of Appeals. (Doc. 12, Exs. EE-GG.) On August 14, 2012, the appellate court granted review, but denied relief, and adopted the trial court's rulings. (Doc. 12, Ex. HH.) A mandate issued on August 8, 2013. (Doc. 12, Ex. JJ.) Petitioner's timely Petition for Writ of Habeas Corpus was filed on April 25, 2014.

## II. EXHAUSTION

Grounds Three, Four, and Five were sufficiently raised as federal claims in Petitioner's Petition for Post-Conviction Relief and on appeal. (Doc. 12, Exs. X, EE, GG.) Grounds One and Two were raised as federal claims in the Petition for Post-Conviction Relief. (Doc. 12, Ex. X at 1.) On appeal, however, Petitioner asserted that Ground One (coercive package-deal plea) warranted an evidentiary hearing and was improperly decided under *Solano* (Doc. 12, Ex. EE at 12); and, "the resolution of" Ground Two (ineffective assistance of counsel's advice regarding the potential sentence) "without a hearing was an abuse of discretion" (Doc. 12, Ex. EE at 18). Petitioner did not raise a federal claim on appeal regarding Grounds One and Two.

Ordinarily, a federal court may not grant a petition for writ of habeas corpus unless the petitioner has exhausted available state remedies. 28 U.S.C. § 2254(b). To exhaust state remedies, a petitioner must afford the state courts the opportunity to rule upon the merits of his federal claims by "fairly presenting" them to the state's "highest" court in a procedurally appropriate manner. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347 (2004) ("[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim").

A claim has been fairly presented if the petitioner has described both the operative facts and the federal legal theory on which his claim is based. *See Baldwin*, 541 U.S. at 33. A claim has been "fairly presented" if the petitioner has described the operative facts and federal legal theories on which the claim is based. *Picard v. Connor*, 404 U.S. 270, 277–78 (1971); *Rice v. Wood*, 44 F.3d 1396, 1403 (9th Cir. 1995). "Our rule is that a

state prisoner has not 'fairly presented' (and thus exhausted) his federal claims in state court unless he specifically indicated to that court that those claims were based on federal law." *Lyons v. Crawford*, 232 F.3d 666, 668 (9th Cir. 2000), amended on other grounds, 247 F.3d 904 (9th Cir. 2001).

The requirement that a petitioner exhaust available state court remedies promotes comity by ensuring that the state courts have the first opportunity to address alleged violations of a state prisoner's federal rights. *See Duncan v. Walker*, 533 U.S. 167, 178 (2001); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). Principles of comity also require federal courts to respect state procedural bars to review of a habeas petitioner's claims. *See Coleman*, 501 at 731–32. Pursuant to these principles, a habeas petitioner's claims may be precluded from federal review when a petitioner failed to present his federal claims to the state court, but returning to state court would be "futile" because the state court's procedural rules, such as waiver or preclusion, would bar consideration of the previously unraised claims. *See Teague v. Lane*, 489 U.S. 288, 297–99 (1989); *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002).

Proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim he raises on habeas by describing the operative facts and federal legal theory upon which the claim is based. *See Picard*, 404 U.S. at 78 ("[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."); *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996) ("If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court.").

**A. Grounds One and Two**

Grounds One and Two are unexhausted because Petitioner did not identify a claim under the United States Constitution when he litigated these grounds on appeal. In order to "fairly present" one's claims, the prisoner must do so "in each appropriate state court." *Baldwin*, 541 U.S. at 29. "Generally, a petitioner satisfies the exhaustion requirement if

he properly pursues a claim (1) throughout the entire direct appellate process of the state, or (2) throughout one entire judicial post-conviction process available in the state." *Casey v. Moore*, 386 F.3d 896, 916 (9th Cir. 2004) (quoting Liebman & Hertz, Federal Habeas Corpus Practice and Procedure, § 23.3b (4th ed.1998)).

Grounds One and Two were raised as federal claims in the Petition for Post-Conviction Relief. (Doc. 12 Ex. X at 1.) On appeal, however, Petitioner asserted that Ground One (coercive package-deal plea) warranted an evidentiary hearing and was improperly decided under *Solano*. (Doc. 12, Ex. EE at 12.) Petitioner argued "In sum, the trial court's analysis of this issue was contrary to the facts before it and established legal precedent on all relevant *Solano* factors. The matter should now be remanded for an evidentiary hearing on this issue." (*Id.* at 16.) For Ground Two (ineffective assistance of counsel's advice regarding the potential sentence), Petitioner argued that "the resolution of this factual dispute without a hearing was an abuse of discretion." (Doc. 12, Ex. EE at 18.) Petitioner did not cite to a federal amendment or raise a federal claim on appeal in his arguments in Grounds One and Two. In his Reply, Petitioner asserted that the sentencing violated federal law, but this argument did not include Grounds One and Two. (Doc. 12, Ex. GG at 8.)

Grounds One and Two are unexhausted and procedurally defaulted because Petitioner cannot file another appeal or PCR on this issue in state court. Under Ariz. R.Crim. P. 31.3, the time for filing a direct appeal expires 20 days after entry of the judgment and sentence. Moreover, no provision is made for a successive direct appeal. Accordingly, direct appeal is no longer available for review of Petitioner's unexhausted claims. Petitioner is also barred from raising his claims by Arizona's time bars. Ariz. R.Crim. P. 32.4 requires that petitions for post-conviction relief (other than those which are "of-right") be filed "within ninety days after the entry of judgment and sentence or within thirty days after the issuance of the order and mandate in the direct appeal, whichever is the later." *See State v. Pruett*, 912 P.2d 1357, 1360 (App. 1995) (applying Rule 32.4 to successive petition, and noting that first petition of pleading defendant

20

deemed direct appeal for purposes of the rule). That time has long since passed.

## B.  Grounds Three, Four, and Five

The Court finds that Petitioner's federal constitutional claims in Grounds Three, Four, and Five were adequately exhausted in the Arizona Superior Court and the Arizona Court of Appeals post-conviction proceedings, where Petitioner raised his claims, citing to the Fifth, Sixth, Eighth, and Fourteenth, Amendments of the Constitution. (Doc. 12, Exs. EE at 19, GG at 8.) Upon review of the briefing to the state courts, the Court finds that these specific claims are more than similar, albeit not identical, to those raised in the Petition before this Court.  Because the Court finds that these claims were presented to the state courts, there is a presumption that they were adjudicated on the merits in those courts. *See Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary .").

## III.   THE PETITION FAILS ON THE MERITS.

Petitioner's claims fail on the merits.

### A. Ground One – "Package Deal" Plea Agreement

In Ground One, Petitioner alleges that his guilty plea was the result of coercion based on the State's insistence on a "package-deal" plea agreement. He contends that this coercion rendered his plea involuntary and violated the Due Process Clause. He claims that had "the court properly considered all the *Solano*[3] factors it would have rejected the plea and allowed the Petitioner to negotiate an individual plea that was consistent with his particular degree of culpability." (Doc. 1 at 18.)  The trial court conducted a proper plea

---

[3] *Solano*, 724 P.2d at 402 (adopting these factors (1) whether the inducement to plead was proper, in that the prosecutor acted in good faith and had a reasonable case against any third party to whom leniency is promised; (2) whether there is a factual basis for the plea in terms of supportable evidence and proportionality of sentence; (3) whether the nature and degree of coercion and psychological pressure upon the defendant indicate the plea is involuntary; (4) whether the promise of leniency to another was a significant or insignificant concern to the defendant in his choice to plead guilty; and (5) whether any other relevant factor impermissibly influenced defendant's plea.").

1    colloquy and discussed the issue of coercion with Petitioner.  Petitioner's plea was
2    voluntary and Petitioner's claim is not supported by the record.

3        A prosecutor's promise to treat a third party leniently during plea bargaining is not
4    "coercive per se." *See, e.g.*, *United States v. Caro*, 997 F.2d 657, 659-60 (9th Cir. 1993)
5    (if the trial court is aware that co-defendants are entering into a package deal arrangement
6    and conducts a more careful examination of the voluntariness of the pleas, contingent
7    plea agreements are permissible); *United States v. Castello*, 724 F.2d 813, 815 (9th Cir.
8    1984) ("None of these courts has held that third party threats or promises are coercive per
9    se."). In *Bordenkircher v. Hayes*, 434 U.S. 357, 365 n. 8 (1978), the Court, in dicta,
10   simply cautioned that "a prosecutor's offer during plea bargaining of adverse or lenient
11   treatment for some person other than the accused . . . might pose a greater danger of
12   inducing a false guilty plea by skewing the assessment of the risks a defendant must
13   consider."  The ultimate question is whether a defendant's decision to plead guilty was
14   voluntary and intelligent.  "The longstanding test for determining the validity of a guilty
15   plea is 'whether the plea represents a voluntary and intelligent choice among the
16   alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56
17   (1985) (citing *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).

18       Petitioner's statements during his plea proceedings establish that his decision to
19   plead guilty was voluntarily made.  The trial court conducted a plea colloquy that also
20   included specific questions regarding the nature of the package plea offer.  In such cases,
21   "the prosecutor must alert the district court to the fact that codefendants are entering a
22   package deal" because these deals "pose an additional risk of coercion not present when
23   the defendant is dealing with the government alone." *Caro*, 997 F.2d at 659–60. The
24   court must then perform a "more careful examination of the voluntariness of a plea . . . ."
25   *Id.* at 659 (quoting *Castello*, 724 F.2d at 815). This "more careful examination" requires
26   "[s]pecifically [that] the court . . . find whether [the defendant] entered [the] plea because
27   of threats or pressures from . . . codefendants." *Id.* at 660.  The trial judge conducted a
28   thorough plea colloquy.

22

During the plea hearing, the court specifically addressed Petitioner regarding the package-deal plea. (*Id*. at 33.) Co-defendant Travis Hiland's counsel stated he had gone over the meaning of the *Solano* case with all three Hiland defendants, including Petitioner. (*Id*. at 34.) The court had the following exchange with Petitioner and his brother, Travis:

| | |
|---|---|
| COURT: | I think with regard to the case law, Mr. Williams, Mr. Napper, because this is a package deal, I think I need some further record under *Solano* with regard to that. |
| | So, Mr. Black or Mr. McGrane, if you are familiar with the factors in *Ybarra* and *Solano*, it seems apparent to me, honestly, because I have been dealing with this case, that there may be some reasons for the negotiation that does a joint or package plea agreement. But do you want to expound on that at all? |
| MR. WILLIAMS: | Judge, if I could assist on that. |
| COURT: | Mr. Williams. |
| MR. WILLIAMS: | We entered into the 17.4 negotiation before Judge Brutinel with the State and all four defendants in the case. I put on the record when we started my Solano concerns. The Court then got a copy of it. The State, I believe, provided that copy. |
| | I have gone over what that means with all four, or actually, all three of the Hilands, and in particular with my client, Travis, and I can tell the Court that he is not receiving this plea so that another member of his family gets is a favorable plea. |
| | The reason we took out the accomplice language and the conspiracy language of the plea agreement is because he is entering this plea agreement for his own actions, and it is his own decision. And that is what I will put on the record, Judge. |
| COURT: | Travis, is that correct? |
| TRAVIS: | Yes. |
| COURT: | You are doing this of your own volition for the things that you are facing, the potential consequences of going to trial     that you are |

| | | |
|---|---|---|
| 1 | | facing, not because the other family member or members may receive benefit from this? |
| 2 | TRAVIS: | That's correct. |
| 3 | COURT: | Tyson, is that your position, also? |
| 4 | PETITIONER: | The same. |
| 5 | COURT: | You are doing this for your own sake based on what is being offered to you, not because some other family member, either your brother or your father, is getting some kind of deal? |
| 6 | | |
| 7 | | |
| 8 | PETITIONER: | I know. |
| 9 | COURT: | Is there any other fact, then, other than the plea agreement itself and what you are looking at there, in terms of consequences versus going to trial and the consequences or possible outcome there, that is influencing you to any degree, Travis? |
| 10 | | |
| 11 | | |
| 12 | TRAVIS: | No. |
| 13 | COURT: | Tyson, any other considerations that are influencing you, other than your own viewpoint of the benefits of the plea agreement versus going to trial? |
| 14 | | |
| 15 | PETITIONER: | No. |
| 16 | | |

(*Id*. at 34–35.)

A defendant's contemporaneous statements regarding his understanding of the plea agreement carry substantial weight in determining the voluntariness of a guilty plea. *United States v. Mims*, 928 F.2d 310, 313 (9th Cir. 1991). The court may properly credit a defendant's testimony at a hearing regarding entry of a guilty plea over any subsequent declarations to the contrary. *See Castello*, 724 F.2d at 815.

Based on the record, Petitioner has not shown that his guilty plea was involuntary and has not established a Due Process violation. Petitioner's plea was voluntary and intelligent as required by *Hill v. Lockhart*, *supra*, and *Boykin v. Alabama*, 395 U.S. 238 (1969). Therefore, Petitioner cannot show that the state court's rejection of this claim was based on an unreasonable determination of the facts, or that it was contrary to, or an unreasonable application of, established federal law. *See* 28 U.S.C. § 2254(d).

24

1    Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

2    **B.  Ground Two – Guilty Plea Ineffective Assistance of Counsel**

3    Petitioner asserts that counsel provided ineffective assistance during the plea

4    process. Petitioner claims that counsel advised him to accept the plea agreement because

5    he would "most likely receive concurrent sentencing" with probation and jail, or at worst

6    a "prison term in a 'minimum' yard (which Petitioner took to mean the presumptive term

7    of 5 years or less)." (Doc. 1 at 19-20.) Petitioner asserts that counsel was ineffective

8    because he failed to relay the assessment of Judge Brutinel (the settlement conference

9    judge) "that the likely result was a maximum sentence." (*Id*.) Petitioner claims that if he

10   had "known" that he would be sentenced to a 10-year prison sentence and consecutive

11   probation, then "he would not have pled guilty. . . ."  (Doc. 1 at 20.)

12   The court of appeals' determination that Petitioner failed to prove ineffective

13   assistance of counsel regarding the guilty plea was not based on an unreasonable

14   determination of the facts, or an unreasonable application of established federal law.

15   Even if counsel said the "most likely" outcome would not exceed five years of

16   imprisonment, that claim implicitly concedes that counsel advised Petitioner that a longer

17   sentence was possible. Petitioner knew the prosecution was likely requesting a prison

18   sentence up to 12.5 years, and Petitioner repeatedly acknowledged he knew his ultimate

19   sentence was permissible under the plea.

20   The negotiation of a plea bargain is "'a critical phase of litigation for purposes of

21   the Sixth Amendment right to effective assistance of counsel.'" *Missouri v. Frye*, 132 S.

22   Ct. 1399, 1406 (2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356 (2010)). If counsel has

23   misadvised a defendant about the law during a plea negotiation, or improperly coerced a

24   defendant to accept a plea bargain, counsel's performance may be found deficient. *See*

25   *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012) (counsel's erroneous legal advice about

26   possibility of conviction that led to rejection of plea offer constituted deficient

27   performance). "If a plea bargain has been offered, a defendant has the right to effective

28   assistance of counsel in considering whether to accept it." *Id*. at 1387. To satisfy

25

*Strickland*'s[4] prejudice prong when a petitioner has pleaded guilty, he must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59 (citations omitted).

Even if counsel had advised Petitioner that the most likely "worst case scenario" was a five-year prison term, Petitioner has not established that this advice was unconstitutionally deficient or prejudicial. "To establish a claim of ineffective assistance of counsel based on alleged erroneous advice regarding a guilty plea, a petitioner must demonstrate more than a 'mere inaccurate prediction.'" *Sophanthavong v. Palmateer*, 378 F.3d 859, 868 (9th Cir.2004) (quoting *Iaea v. Sunn*, 800 F.2d 861, 864–65) (9th Cir. 1986)). Defense counsel's alleged erroneous predictions as to the likely sentence following a guilty plea, "are deficient only if they constitute 'gross mischaracterization of the likely outcome' of a plea bargain 'combined with . . . erroneous advice on the probable effects of going to trial.'" *Id*. (quoting *United States v. Keller*, 902 F.2d 1391, 1394 (9th Cir. 1990)).

Furthermore, if the defendant was informed prior to entering his guilty plea of the potential sentence he could receive, he cannot establish prejudice from counsel's incorrect prediction as to his sentence. *See Womack v. Del Papa*, 497 F.3d 998, 1003–4 (9th Cir. 2007) (finding that because the defendant was informed of the maximum possible sentence, "he cannot demonstrate that he was prejudiced by his attorney's prediction."); *United States v. Garcia*, 909 F.2d 1346, 1348 (9th Cir. 1990) (explaining that an erroneous sentence prediction "does not entitle a defendant to challenge his guilty plea").

Here, Petitioner does not assert that counsel actually told him a five-year sentence was the most likely prison term.  Petitioner concedes that at worst, counsel told him he would receive prison time in a "'minimum yard' (which Petitioner took to mean the presumptive term of five years or less)."  (Doc. 1 at 20.) Petitioner's assumption that a

---

[4] *Strickland v. Washington*, 466 U.S. 668 (1984).

"minimum yard" would equal no more than a term of five years is Petitioner's fault not counsel's. Even if counsel advised that a five-year sentence was most likely the maximum he would receive, that advice was not a gross mischaracterization. The settlement judge agreed that concurrent, imprisonment sentences were likely. Judge Brutinel told Petitioner, the codefendants and the attorneys ". . . I kind of agree with your position that it strikes me concurrent time is probably appropriate here, but that's up to the trial judge." (Doc. 12, Ex. KK at 14.) The ultimate question was the length of that sentence, and Petitioner was repeatedly advised it could include imprisonment up to 25 years. Petitioner also knew the prosecution was requesting a sentence of imprisonment up to 12 years and six months. Petitioner did not in fact receive a maximum sentence of imprisonment, and his ultimate sentence was within the range he explicitly agreed the court could impose. The court of appeals decision was not based on an unreasonable determination of the facts, or that it was contrary to, or an unreasonable application of, established federal law. *See Womack*, 497 F.3d at 1003–4.

### C.  Ground Three – Consecutive Sentences for Theft/Fraud Schemes

Petitioner asserts that his consecutive sentences for Theft and Fraudulent Schemes and Artifices violate the Double Punishment Clause of the Fifth Amendment because the two offenses "were based on identical operative facts. . . ." (Doc. 1 at 21.) The Double Jeopardy Clause "protects against multiple punishments for the same offense." *See Ohio v. Johnson*, 467 U.S. 493, 498-99 (1984) (citation omitted). To determine whether a double jeopardy violation has occurred, the court applies the same-elements test, also known as the *Blockburger*[5] test, which "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offense' and double jeopardy bars additional punishment and successive prosecution." *United States v. Dixon*, 509 U.S. 688, 696 (1993).

Theft required the state to prove that a defendant knowingly and without lawful

---

[5] *Blockburger v. United States*, 284 U.S. 299 (1932).

27

authority either: (a) controlled the property of another with the intent to deprive that person of the property; (b) converted for an unauthorized use or term another person's property which was entrusted to him; or (c) obtained the property of another by means of a material misrepresentation with the intent to deprive that person of the property. A.R.S. § 13–1802. A scheme or artifice to defraud under A.R.S. § 13–2310 contains two elements: (a) the existence of a scheme or artifice to defraud; and (2) knowingly obtaining a benefit by means of false pretenses, false representations or material omissions. The trial court denied Petitioner's PCR allegation on this ground, finding that the "act of fraud scheme is separate from the act of the actual taking of the funds for their own use." (Doc. 12, Ex. AA at 9.) The trial court concluded that "[c]onsecutive sentencing under *Gordon* is not contrary to law in this case." (*Id*.) The Arizona Court of Appeals affirmed this conclusion. (Doc. 12, Ex. HH at 2.)

The Arizona Court of Appeal's decision was not an unreasonable application of clearly established Federal law or an unreasonable determination of the facts. Theft can be established by proving that a defendant controlled, converted, or obtained the property of another, elements that are not found in the fraudulent scheme statute. A scheme to defraud and the attainment of a benefit are not required to prove a theft. Under the *Blockburger* same-elements test, these offenses are not the same and consecutive sentences do not violate the Double Jeopardy Clause. *See United States v. Saccoccia*, 18 F.3d 795, 798 (9th Cir.1994) (citing *United States v. Felix*, 112 S.Ct. 1377, 1384 (1992)) ("A substantive crime and a conspiracy to commit that crime are not the same offense for double jeopardy purposes."); *United States v. Williams*, 527 F.3d 1235, 1252 (11th Cir. 2008) (convictions for wire fraud and theft do not violate the Fifth Amendment Double Jeopardy Clause because each crime satisfies the *Blockburger* test); *State v. Harper*, 868 P.2d 1027, 1029 (App. 1993) (noting that a defendant could commit either theft or money laundering without also committing the other).

Any claim by Petitioner that there was a violation of state law during sentencing is not subject to federal habeas corpus review. *See Cacoperdo v. Demosthenes*, 37 F.3d 504,

28

507 (9th Cir. 1994) (finding that petitioner's claim that the state court erred in imposing consecutive sentences was not cognizable in federal habeas); *Hendricks v. Zenon*, 993 F.2d 664, 674 (9th Cir. 1993) (holding that "claim regarding merger of convictions for sentencing is exclusively concerned with state law and therefore not cognizable in a federal habeas corpus proceeding."); *Miller v. Vasquez*, 868 F.2d 1116, 1118–19 (9th Cir. 1989) (refusing to consider alleged errors in violation of state sentencing law).

### D.  Ground Four – Excessive Sentence

Petitioner asserts that the trial court "improperly considered aggravating and mitigating factors, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (Doc. 1 at 22.)  Petitioner specifically alleged in his PCR Petition that this was a "violation of Arizona law" and a violation of the "double punishment clause of the Fifth Amendment." (Doc. 12, Ex. X at 16-17.)

Petitioner's allegation that the trial court committed a sentencing error, under the relevant state law, is not cognizable on federal habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Jackson v. Ylst*, 921 F.2d 882 (9th Cir. 1990) (federal court has no authority to review state application of state law); *Miller*, 868 F.2d at 1118–19 (refusing to consider alleged errors in violation of state sentencing law); *Rhoades v. Henry*, 638 F.3d 1027, 1053 (9th Cir. 2011) (refusing to adjudicate a state law sentencing "double counting" issue).  Petitioner's argument is copied almost verbatim from his PCR Petition, which primarily argues a claim under Arizona state law.

There is also no fundamental unfairness present in Petitioner's sentence. *See Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994) ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief.").  Petitioner owes $1.6 million in restitution for his participation in a scheme that impoverished numerous elderly victims. Petitioner was sentenced below the maximum terms he knowingly authorized.  Petitioner has not demonstrated fundamental unfairness.

The trial court also properly considered Petitioner's financial gain and resulting

impact to the victims. A court may consider pecuniary gain to the Petitioner without implicating double-punishment concerns in a theft case. Theft only requires the taking of property, which could have no monetary value (e.g. family photographs or letters). *See Woratzeck v. Stewart*, 97 F.3d 329, 335–36 (9th Cir.1996) (finding pecuniary gain in a felony murder sentencing an appropriate aggravating factor because robbing a person of property does not "necessarily" prove that a defendant was motivated by the expectation of pecuniary gain). Moreover, a court may consider economic harm to the victims. *See* Ariz.Rev.Stat. Ann. § 13–702(C); *United States v. Rangel*, 688 F.3d 972, 981 (9th Cir. 2012) (District court appropriately focused upon "the impact on the victims of [the defendant's] crimes."). There is no violation of the Fifth Amendment. The Arizona Court of Appeals did not act unreasonably in rejecting this claim.

### E.    Ground Five – Judicial Bias

In Ground Five, Petitioner asserts judicial bias prevented him from receiving fair and impartial hearings. The trial court denied Petitioner's claim and found no bias in the record. Petitioner fails to demonstrate that the Arizona state courts applied federal law or interpreted the facts before them unreasonably; nor does he show that the state courts' denial of his appeal was contrary to federal law.

#### 1.    The "Cahall Letter"

Petitioner asserts that the Cahall letter created "an appearance of impropriety." Petitioner cites to *Taylor v. Hayes*, 418 U.S. 488 (1987) but not does not claim the review of the letter created actual bias. The post-conviction court found there was "no basis in the record to find that Judge Lindberg was biased due to the Cahall letter." (Doc. 12, Ex. AA at 2.) Petitioner has not argued or shown that the state court's resolution of this claim was based on an unreasonable determination of the facts, or that it was contrary to, or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d).

A defendant is entitled to a fair trial, free from judicial bias. *In re Murchison*, 349 U.S. 133, 136 (1955). A petitioner may show judicial bias in one of two ways—by demonstrating the judge's actual bias or by showing that the judge had an incentive to be

biased sufficiently strong enough to overcome the presumption of judicial integrity (i.e., a substantial likelihood of bias). *Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994). "Supreme Court precedent reveals only three circumstances in which an appearance of bias—as opposed to evidence of actual bias—necessitates recusal." *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007) (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). These are (1) when the judge has a direct, substantial pecuniary interest in the outcome of the case; (2) when the judge becomes embroiled in a running, bitter controversy with one of the litigants; and (3) when the judge acts as part of the accusatory process. (*Id.*) (citations omitted).

The determination of judicial bias is a factual question to which the federal courts defer on habeas review. *See* 28 U.S.C. § 2254(d); *Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir. 1997) (stating that state court's finding of lack of judicial bias was entitled to a presumption of correctness). To succeed on a judicial bias claim, a petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47. The Supreme Court has stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555 (1994).

Petitioner's burden to demonstrate actual bias is extremely high because there is a presumption that judicial officials have "properly discharged their official duties." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (quoting *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480 (1996)). Additionally, the Supreme Court has held that "only in the most extreme cases would disqualification [for bias or prejudice] be constitutionally required." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821, 106 S.Ct. 1580 (1986).

Here, Petitioner fails to establish actual bias or the appearance of impropriety. Petitioner's PCR Petition alleged the trial court was biased after it reviewed a letter from "retired Detective Cahall who spearheaded the investigation" and the detective referenced

31

a former case that Cahall and the judge had worked on together. (Doc. 12, Ex. X at 20.) The trial court and the court of appeals found no judicial bias because the court "indicated several times on the record it had stricken and not considered" the "Cahall letter" and there was no bias found in the record. (Doc. 12, Ex. AA at 30.)  Petitioner's claim regarding the "Cahall letter" fails.

### 2.  Denial of Motions and Request for Transcript

Petitioner also asserts that Judge Lindberg's denial of several motions (state disqualification, a transcript request, a continuance, and discovery requests) demonstrates bias and prejudice against Petitioner.[6] The record does not reflect such bias. "[J]udicial rulings alone almost never constitute [a] valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. Adverse rulings should be appealed; they do not form the basis for a recusal motion. Opinions formed in the courtroom "do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*

Plaintiff has not shown that the trial court's denial of motions that Petitioner and his co-defendants filed immediately before sentencing was based on bias. The record reflects that the trial court considered arguments from counsel on the motions. (Doc. 12, Ex. ZZ at 30-62.) Although the trial court did not elaborate on its rulings, it apparently determined that the Cahall letter, which the trial court struck and did not consider at sentencing, did not warrant further discovery, continuing the trial, or disqualifying the county attorney's office. (Doc. 16, Ex. ZZ at 62.) The court also determined that no inquiry into the State's communications with the victims was necessary. (*Id.*) The court's denial of a request for a transcript of the sentencing hearing in relation to a post-conviction proceeding does not establish the court was biased against Petitioner.

---

[6] Petitioner also alleges that a denial of the motion to recuse Judge Lindberg demonstrates bias. Judge Lindberg did not rule on this motion. Judge Lindberg referred the motion to disqualify to Judge Brutinel. (Doc. 12, Ex. ZZ at 6-9; Ex. O.) Judge Brutinel denied the motion. Petitioner does not allege Judge Brutinel was biased. Referral of this motion to Judge Brutinel demonstrates a lack of bias by Judge Lindberg.

### 3. Prosecutorial Misconduct

Petitioner alleges the court "allowed the state to engage in ongoing prosecutorial misconduct discussed above." (Doc. 1 at 27.) This is Petitioner's sole sentence on this allegation. Petitioner's argument is devoid of factual reference or legal citation. Petitioner's reference to "misconduct discussed above" is unacceptably vague. Petitioner's claim is denied. *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) ("We have cautioned that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived, and that it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation and internal quotation marks omitted).

### 4. Different Standards of Treatment for Defense and Prosecution

To support his judicial bias claim, Petitioner also asserts that Judge Lindberg had "different standards of treatment" for the prosecution and defense during the presentence hearing. (Doc. 1 at 27.) To support this claim of bias, Petitioner points to the trial court urging the defense to pick up the pace of it presentation of its case and to the court's statement that defense witnesses could become cumulative. (*Id.*)

These incidents do not establish judicial bias. The trial court's request that defense counsel increase the pace of their presentation, its concern about cumulative witnesses, and its rulings on the formulation of questions to the witnesses were part of the trial court's management of a lengthy pre-sentence hearing that included 20 witnesses who spoke on behalf of Petitioner and his codefendants. (Doc. 12, Exs. NN-SS; Doc. 16, Exs. TT-YY.) Petitioner's conclusory allegations are insufficient to establish that the trial court's management of the presentencing hearing was biased against Petitioner or to establish that he is entitled to habeas corpus relief. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (citation omitted) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

Accordingly, Petitioner has not shown that the state court's resolution of this claim

33

was based on an unreasonable determination of facts, or that it was contrary to, or based on an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d).

**IV. Request for an Evidentiary Hearing**

Petitioner requests an evidentiary hearing. (Doc. 1.) Under 28 U.S.C. § 2254(e)(2), a petitioner is entitled to an evidentiary hearing if he presents a "meritorious claim" and he exercised reasonable diligence in developing the factual record in the state proceedings. *Williams v. Taylor*, 529 U.S. 420, 434-37 (2000). A petitioner exercises the diligence necessary to preserve a claim if "the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id*. at 435. Thus, to qualify for an evidentiary hearing, Petitioner must both: "(1) allege facts which, if proven, would entitle him to relief, and (2) show that he did not receive a full and fair hearing in a state court, either at the time of the trial or in a collateral proceeding." *Belmontes v. Brown*, 414 F.3d 1094, 1124 (9th Cir. 2005). No hearing is necessary, however, if this Court "is able to determine without a hearing that the allegations are without credibility or that the allegations if true would not warrant a new trial . . . ." *United States v. Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir. 1991).

Based on its review of Petitioner's claims, as set forth above, the Court finds that Petitioner has not made any allegations that, if true, would warrant habeas relief, and finds that his allegations (particularly his allegations related to the voluntariness of his guilty plea asserted in Grounds One and Two) are without credibility. Accordingly, an evidentiary hearing is not warranted.

## CONCLUSION

Based on the above analysis, the Court finds that two of Petitioner's claims are procedurally barred from review and all fail on the merits.

**IT IS THEREFORE RECOMMENDED** that the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH PREJUDICE**.

1    **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and

2    leave to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the

3    Petition is justified by a plain procedural bar and jurists of reason would not find the

4    procedural ruling debatable, and because Petitioner has not made a substantial showing of

5    the denial of a constitutional right.

6        This recommendation is not an order that is immediately appealable to the Ninth

7    Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

8    Appellate Procedure, should not be filed until entry of the district court's judgment. The

9    parties shall have 14 days from the date of service of a copy of this recommendation

10   within which to file specific written objections with the Court. *See* 28 U.S.C. § 636(b)(1);

11   Fed. R. Civ. P. 6(a), 6(b) and 72. Thereafter, the parties have 14 days within which to file

12   a response to the objections.

13       Failure to timely file objections to the Magistrate Judge's Report and

14   Recommendation may result in the acceptance of the Report and Recommendation by the

15   district court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114,

16   1121 (9th Cir. 2003). Failure to timely file objections to any factual determinations of the

17   Magistrate Judge will be considered a waiver of a party's right to appellate review of the

18   findings of fact in an order of judgment entered pursuant to the Magistrate Judge's

19   recommendation. *See* Fed. R. Civ. P. 72.

20       Dated this 15th day of April, 2015.

21

22

23       Honorable John Z. Boyle
         United States Magistrate Judge

24

25

26

27

28

                                        35